ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| PDO Ahusaka Joint Venture LLC | )   ASBCA No. 64490 |
| | ) |
| Under Contract No. W56HZV-20-C-L865 | ) |

APPEARANCE FOR THE APPELLANT:    Mr. Robert M. Pastorelli
                    Executive Program Manager

APPEARANCES FOR THE GOVERNMENT:    Dana J. Chase, Esq.
                    Army Chief Trial Attorney
                    MAJ Joseph C. Van Dusen, JA
                    Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE HERZFELD
## PURSUANT TO BOARD RULE 12.2

PDO Ahusaka Joint Venture LLC (PDO) seeks an equitable adjustment from the Department of the Army (Army) based on claimed differing site conditions. PDO elected to proceed under the Board's Small Claims (Expedited) procedures, ASBCA Rule 12.2. The Contract Disputes Act, 41 U.S.C. §§ 7106(b)(4)-(5), as implemented by ASBCA Rule 12.2, provides that this decision shall have no precedential value, and in the absence of fraud shall be final and conclusive and may not be appealed or set aside. The parties requested that we proceed to the merits without hearing under ASBCA Rule 11 and decide both entitlement and quantum. The Board sustains PDO's appeal, in part, and denies it, in part.

## FINDINGS OF FACT

On September 25, 2020, the Army issued a solicitation to the Small Business Administration through the 8(a) Program, which awarded PDO a firm fixed-price contract to design and build a storm system upgrade and flood control project at the U.S. Army Garrison-Detroit Arsenal in Warren, Michigan (R4, tab 1 at 1, 3-8, 12, 31, 40; *id.* at 132-33 (incorporating Federal Acquisition Regulation (FAR) 52.219-17, SECTION 8(a) AWARD (OCT 2019))).

The contract required PDO to "obtain utility maps" from the Army and "field verify and mark actual location of utilities in the vicinity of proposed work," notifying the Army of "any conflicts during early stages of design and prior to start of construction" (R4, tab 1 at 47, 57). The contract warned: "No guaranties are made by the Government to the exactness and/or accuracy of provided utility information" (*id.*

at 47).  The contract stated that the Army "will provide courtesy utility identification of known existing underground utilities in the work area" and "may field locate utilities for the contractor" (*id.* at 56-57).  The contract emphasized this underground utility information was "approximate" and a "courtesy" (*id.* at 56).

Consistent with the contract, the Army furnished PDO with as-built utility drawings depicting the known locations of buried utilities across the Detroit Arsenal (R4, tabs 21-33).  The "utilities as shown are from record data," but "[n]o guarantees are made to the exactness of size or location" of the utilities (R4, tabs 25-26).  All the as-builts stated that they were "NOT FOR CONSTRUCTION – REFERENCE ONLY" (R4, tabs 21-33).

As to field verification of utilities, the contract first required PDO to secure an excavating permit before performing subsurface investigations, which PDO did (R4, tab 1 at 57, tabs 129-31, 136).  Second, the contract required PDO to use MISS DIG to mark the underground utilities, which PDO did through one of its subcontractors (R4, tab 1 at 57, tab 137).  Third, the contract required PDO to hire a subcontractor to locate "utilities within excavation, boring, tunneling area" and recommended several methods for field verification including "'Underground Radar Penetration' and exploratory trenches" (R4, tab 1 at 57).  Indeed, the contract required PDO to use "ground penetrating radar to verify all underground utilities," which PDO did (R4, tab 1 at 18, tabs 126-27).  PDO used subcontractors to conduct and analyze soil boring results and geotechnical investigations (R4, tabs 124, 128, 134-35).

During performance, PDO's subcontractor encountered three underground junction boxes where it was digging on June 3, 2022 (R4, tabs 15, 95, 100, 149).  "A junction box is an air-tight, sealed container that is meant to provide additional protection where fiberoptic cables are spliced together" (R4, tab 146, tab 148 at 2).  PDO's subcontractor had been soft excavating this location and moved the three junction boxes to the side (R4, tab 15 at 2, tab 148 at 2).  The Army's drawings (which the contract required PDO to consult) did not identify the junction boxes at this location (R4, tab 15 at 3-5, tab 100 at 3-5, tab 149 at 2).

After several days of significant rain, the Detroit Arsenal fire department notified the contracting officer's representative of emergency communications service disruptions (R4, tab 15 at 2, tab 147 at 5).  The contracting officer's representative notified the Network Enterprise Center, which determined that the junction boxes were the cause of the disruptions (R4, tab 147 at 5, tab 148 at 2).  Notably, the Army's contracting officer's representative first learned of the junction boxes from the Detroit Arsenal fire department, not PDO or its subcontractor (R4, tab 147 at 5).  More than two weeks passed before PDO informed the contracting officer's representative regarding the three unidentified junction boxes (*id.*).

PDO, its subcontractor, and Army personnel met later that week at the site (on June 22, 2022) to discuss the issue and the Army directed PDO's subcontractor to troubleshoot the problem including determining the level of damage to the cables inside the junction boxes (R4, tab 15 at 2-3). Despite the two-week delay in PDO providing notice, the Army still provided feedback and direction about how PDO should remedy this issue including opening the junction boxes (R4, tab 15 at 2-3, tab 142 at 1). The contracting officer's representative took the position that "PDO caused the damage to the junction boxes by failing to exercise reasonable care after excavating the junction boxes" (R4, tab 147 at 5, tab 148 at 2-3). PDO objected, asserting that it was not responsible for troubleshooting because "these boxes were not shown on the drawings, and we had no information about their existence or location" (R4, tab 15 at 2, tab 151 at 5). Notwithstanding its objection, PDO excavated and backfilled the area, and repaired the underground fiber splicers that had been damaged (R4, tab 16 at 13).

In a different location (on June 23, 2022), PDO's subcontractor also unearthed and damaged two communication conduits while machine excavating in preparation to install part of the storm system (R4, tab 14 at 2, tab 142 at 1, tab 147 at 4, tab 149 at 1). Conduits "are tubes that can be made from plastic, rubber, or metal and are meant to protect more sensitive fiberoptic cables running underground between buildings and telecommunications hubs" (R4, tab 148 at 2). The conduits at this location were not identified in the drawings the Army provided but the as-built drawings did identify water, electrical, and gas lines in this location (R4, tab 14 at 4-5, tab 99 at 4-5, tab 149 at 1). Unlike the junction boxes, the damage did not disrupt communications and the Army determined the encased fiberoptic cables were undamaged (R4, tab 14 at 2, tab 148 at 2). PDO repaired the conduits including backfilling the area and performing other work as part of the repairs (R4, tab 16 at 7).

After the Army's contracting officer indicated that a "price adjustment may be appropriate" regarding these site conditions, PDO submitted requests for equitable adjustment for the costs of repairing the junction boxes and conduits (R4, tabs 77, 96-97, 99-100). PDO relied on the contract's Differing Site Conditions clause for recovery (R4, tab 96 at 3-7, tab 1 at 125 (incorporating by reference FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984)). The Army's contracting officer denied the requests for equitable adjustment, concluding that (1) the conduits and junction boxes were not differing site conditions and (2) PDO was required to repair the damaged conduits and junction boxes pursuant to the contract's Protection of Existing Vegetation, Structures, Equipment, Utilities, and Improvements clause (R4, tab 1 at 125, tab 106 at 5-8 (incorporating by reference FAR 52.236-9, PROTECTION OF EXISTING VEGETATION, STRUCTURES, EQUIPMENT, UTILITIES, AND IMPROVEMENTS (APR 1984)).

Thereafter, PDO filed a certified Contract Disputes Act (CDA) claim requesting $38,935.29 for the differing site conditions—$29,137.65 for the junction boxes,

$9,797.64 for the conduits (R4, tabs 12-16). The contracting officer denied PDO's certified claim based on the same rationale it denied the requests for equitable adjustment, issuing a final decision on December 22, 2025 (R4, tab 18). PDO timely appealed to this Board and elected to proceed under the Board's Rule 12.2 expedited procedures (as discussed above).

## DECISION

### I.       *Standard of Review*

Board Rule 11 allows the parties to waive a hearing and submit an appeal on the written record. ASBCA Rule 11(a); *Consorzio Stabile GMG S.c.ar.l.*, ASBCA No. 62753, 23-1 BCA ¶ 38,347 at 186,213. Under Board Rule 11, we conduct a trial on the written record; we may weigh evidence, including resolving any disputed facts in making our findings of fact and rendering our decision. *D-STAR Eng'g Corp.*, ASBCA Nos. 62075, 62780, 25-1 BCA ¶ 38,816 at 188,819, 188,826. We conduct a *de novo* review without deference to the contracting officer's final decision. *Dep't of Transp. v. Eagle Peak Rock & Paving, Inc.*, 69 F.4th 1367, 1374-76 (Fed. Cir. 2023); 41 U.S.C. § 7103(e).

### II.      *PDO Has Proven Type I Differing Site Conditions Regarding the Junction Boxes, But Not the Conduits*

PDO asserts that it should recover its incurred costs related to the junction boxes and conduits based on a Type I differing site condition (app. reply at 4). A Type I differing site condition occurs where a contractor encounters "subsurface or latent physical conditions at the site which differ materially from those indicated" in the contract. FAR 52.236-2(a) (incorporated by reference in the contract, R4, tab 1 at 125). To recover for a Type I differing site condition, PDO bears the burden of proving the following four elements: (1) a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions; (2) the actual site conditions were not reasonably foreseeable to the contractor at contract formation, given the information available to the contractor outside the contract documents; (3) the contractor relied on the contract's representation; and (4) the conditions materially differed from the contract's representations resulting in contractor damages. *Meridian Eng'g Co. v. United States*, 885 F.3d 1351, 1356 (Fed. Cir. 2018); *Skanska USA Civ. Se., Inc.*, ASBCA Nos. 61220, 61347, 25-1 BCA ¶ 38,804 at 188,746.[1] PDO has proven a differing site condition as to the junction boxes, but not the conduits.

---

[1] In its opening brief, the Army argues that PDO assumed the risk of underground utilities because the parties entered a firm fixed-price contract (gov't br. at 7-14); FAR 16.202-1. However, this argument ignores the Differing Site Conditions clause, which "exists precisely in order to take at least some of the

First, the contract made material representations regarding the location of underground utilities. The contract stated that the Army "will provide utility identification of known existing underground utilities in the work area" and required PDO to use as-built utility maps provided by the Army (R4, tab 1 at 47, 56-57, tabs 21-33). The contract also included several exculpatory clauses, stating "no guarantees are made to the exactness of size or location" of utilities and that the utilities on the map were "approximate," provided as a "courtesy," or for "reference only" (R4, tabs 25-26, tab 1 at 56). The Army asserts that these disclaimers made it unreasonable for PDO to rely on the contract's representations as to underground utility locations (gov't reply at 4-5). However, such "broad disclaimers 'of liability for changed conditions'" do not shift the risk from the government to the contractor. *Metcalf*, 742 F.3d 984 at 996 (internal citations and quotations omitted). Indeed, "[g]overnmental disclaimers of responsibility for the accuracy of specifications which it authors are viewed with disdain by the courts." *R.L. Persons Constr., Inc.*, ASBCA No. 60121, 18-1 BCA ¶ 37,007 at 180,237 (internal quotations and citations omitted).

Second, the actual site conditions were not reasonably foreseeable to PDO at the time it entered the contract based on information outside the contract. Any unidentified utilities were below ground and would not have been visible outside of the information provided in the contract. *Metcalf*, 742 F.3d at 996 (stating that the duty to inspect "does not negate the changed conditions clause by putting the contractor at peril to discover hidden subsurface conditions"). The Army asserts that the contract's requirement for PDO to obtain an excavating permit, to comply with state law governing excavation, notify MISS DIG to have utilities marked, and notify utility owners prior to digging should have placed PDO on notice that it was reasonably foreseeable PDO would encounter unidentified underground utilities (gov't reply at 5-6; R4, tab 1 at 57). However, a mere requirement that PDO follow safe excavation procedures does not somehow negate the differing site conditions clause. The Army also asserts that, once PDO encountered the unidentified junction boxes, it should have been reasonably foreseeable that it would encounter additional unidentified utilities (such as the conduits it uncovered later) (gov't reply at 6). Yet, we measure reasonable foreseeability of site conditions at the time of contract formation, not during performance. *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1352 (Fed. Cir. 2008).

Third, the record reflects that PDO relied on the contract's representation of utilities as it performed the contract (R4, tabs 14-15). The Army asserts that because the contract required a geotechnical survey, PDO could not have reasonably relied on the as-built drawings citing *CCI, Inc.*, ASBCA No. 57316, 14-1 BCA ¶ 35,546

---

gamble on subsurface conditions out of bidding" and acts to lower contractor risk resulting in lower prices to the government. *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 996 (Fed. Cir. 2014) (internal quotation and citation omitted).

at 174,198 (gov't reply at 6-7). In *CCI*, the contractor did not rely on the contract's site indications, nor did it obtain additional geotechnical information in preparing its bid. *CCI*, 14-1 BCA ¶ 35,546 at 174,198-200. Unlike *CCI*, PDO relied on the site indications and PDO (through its subcontractors) conducted a geotechnical survey (R4, tabs 14-15, 124, 128, 134-35).

Fourth, the conditions at the site were materially different than the contract's indications as to the junction boxes, which resulted in the costs the Army required PDO to incur (R4, tab 15). As to the conduits, while the as-built drawings did not list the conduits, they indicated that other utilities ran under that site (as confirmed by the photograph of the site) (R4, tab 14 at 3, tab 147 at 4-5, tab 149 at 1). So, unlike the site of the junction boxes, the conduit site was not materially different from the as-built drawings, given the other utilities at that site. *Randa/Madison J.V. III v. Dahlberg*, 239 F.3d 1264, 1275 (Fed. Cir. 2001) (upholding Board's "finding that there was no material difference between the conditions indicated in the contract and conditions experienced"). Thus, PDO has proven the four elements of a differing site condition as to the junction boxes, but not the conduits.

The Army asserts that PDO's two-week delay in notifying the Army regarding the discovery of the three unidentified junction boxes prejudiced the Army and negates any differing site condition claim (gov't br. at 15-16; gov't reply at 2-3). The Differing Site Conditions clause requires a contractor to "promptly, and before the conditions are disturbed, give notice to the Contacting Officer" of a differing site condition. FAR 52.236-2(a). The government bears the burden of proving prejudice from any untimely notice. *Meltech Corp.*, ASBCA No. 61766 *et al.*, 25-1 BCA ¶ 38,862 at 189,121. First, PDO's notice was still prompt despite the two-week delay; we have found "prompt" notice even 21 months later, for example. *Id.* at 189,120-21. Second, even if not prompt, the Army has failed to establish how it was prejudiced. Untimely notice prejudices the government where it prevents the government from verifying a contractor's differing site condition claim and weighing in on how the contractor should remedy the problem. *Schnip Bldg. Co. v. United States*, 645 F.2d 950, 959-60 (Ct. Cl. 1981); *Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 272 (2006), *aff'd*, 499 F.3d 1357 (Fed. Cir. 2007). Here, the Army examined the site condition and directed PDO regarding how to remediate, which undermines any assertion of prejudice (R4, tabs 15, 138, 140, tab 142 at 1).

### III.    *PDO Exercised Reasonable Care Excavating the Junction Boxes*

The Army asserts that it should not be liable for the differing site condition because the contract included other clauses making PDO liable for repairing any damage to utilities (gov't br. at 14-20; gov't reply at 9-10). PDO asserts that the Army cannot demonstrate that PDO was at fault for the damaged junction boxes (app. reply at 5-8). The Board agrees with PDO.

The Protection of Existing Vegetation, Structures, Equipment, Utilities, and Improvements clause states that PDO "shall protect from damage all existing improvements and utilities . . . at or near the work site" and "shall repair any damage to those facilities . . . resulting from failure to comply with the requirements of this contract or failure to exercise reasonable care in performing the work." FAR 52.236-9(b) (incorporated by reference in contract, R4, tab 1 at 125; *see also id.* at 19, 57). The government essentially invokes this clause as an affirmative defense to our finding a differing site condition. Indeed, the government bears the burden to prove that PDO failed to comply with contractual requirements or failed to exercise reasonable care in performing the work – a negligence standard, not "strict liability." *States Roofing Corp.*, ASBCA Nos. 55500, 55503, 09-1 BCA ¶ 34,036 at 168,349.

The Army asserts that PDO failed to exercise reasonable care by moving the junction boxes, failing to timely notify the Army, and leaving the junction boxes exposed to the elements that resulted in the damage (gov't br. at 14-17). As noted above, we have determined that PDO acted promptly in notifying the Army. As to PDO moving the junction boxes and leaving them exposed, the Army must show that PDO was the cause of the damage and not the differing site condition PDO encountered during the initial excavation. *Giuliani Contracting Co.*, ASBCA No. 33129, 87-1 BCA ¶ 19,519 at 98,657 ("[A] contractor is required to repair damaged utilities at or near the work site only if fault and a causal connection between the fault and damage is established."). The Army notes that the emergency communications were disrupted only after the rain, so the Army attributes the damaged fiberoptic cables to PDO's moving the junction boxes out of the trench (R4, tab 147 at 5, tab 148 at 2-3). While that is possible, it is not clear whether the junction boxes were damaged then or in PDO's initial discovery of the boxes. Had PDO left the junction boxes in the trench (as the Army asserts should have happened), it is possible the fiberoptic cables would still have been damaged by the rain. Because of this uncertainty, the Army has failed to meet its burden of proving that PDO failed to exercise reasonable care. *Kallidus Tech.*, ASBCA Nos. 61377, 61976, 26-1 BCA ¶ 38,971 at 189,735; *see also J.A.K. Constr. Co.*, ASBCA No. 43099, 94-1 BCA ¶ 26,536 at 132,075 (summarizing caselaw that "where the evidence showed two equally plausible causes of damage to equipment, one within the contractor's warranty responsibility and the other the Government's fault, the Government had not carried its burden of proof").[2]

---

[2] As to the conduits, we concluded above that there was no differing site condition. Even if we had concluded there was a differing site condition, we would still find that PDO could not recover because it failed to use reasonable care in excavating the site, as the government argues (gov't br. at 17-19). In its initial excavation of the area around the conduits PDO used machine excavation instead of soft excavation (as it had done in the area near the junction boxes) (R4, tab 14 at 2, tab 142 at 1, tab 147 at 4, tab 149 at 1). PDO asserts that it used machine excavation because there was no way for it to know there were

## CONCLUSION

For the foregoing reasons, the Board sustains PDO's differing site condition claim as to the junction boxes in the amount of $29,137.65, plus CDA interest from September 17, 2025, when the Army received PDO's certified claim. The Board denies PDO's claim as to the conduits.

Dated: July 23, 2026

DANIEL S. HERZFELD
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 64490, Appeal of PDO Ahusaka Joint Venture LLC, rendered in conformance with the Board's Charter.

Dated: July 23, 2026

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

---

utilities in this area (app. reply at 7). Yet, as discussed above, the as-built drawings of the excavated site indicate that other utilities ran under this site (as confirmed by the photograph of the site) (R4, tab 14 at 3, tab 147 at 4-5, tab 149 at 1). PDO should have used other soft excavation techniques rather than machine excavation, given the other utilities indicated at this location. Thus, even if there was a differing site condition as to the conduits, the Army has met its burden of proof and PDO could not recover its conduit costs for this additional reason. *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 287 (2005).

8